And before we get started, is Sinclair going to split its argument? Yes, Your Honor. And so, Mr. Ayers, you're going to go first. Are you covering a specific issue, or... I am. Okay, very good. I think we've got the process down. So, okay, let's get started. Mr. Ayers, you may proceed. Thank you, Your Honors, and may it please the Court. My name is Mark Ayers, and along with my partner, Kate Margolis, we represent Sinclair Wyoming Refining Company. Time permitting and subject to the Court's questions, of course, I'll be addressing Sinclair's appeal in this matter, which concerns the application of Wyoming's attorney fee statute. And my partner, Kate, will address Infrassure's cross-appeal, which concerns the appraisal award. Turning to Sinclair's appeal, the District Court erred in granting Infrassure's Rule 12b motion to dismiss Sinclair's claim to attorney's fees under Wyoming Statute 2615-142, which is part of the Wyoming Insurance Code. But the primary issue doesn't really concern that provision, but subsection 101A2 of that same chapter is a gateway provision as it controls the applicability of the entirety of Chapter 15 of Wyoming's Insurance Code. Under 101A2, the provisions of Chapter 15 do not apply to a policy that's not been, quote, delivered or issued for delivery in Wyoming. Of course, this is a state law, and as this Court has made clear many times, this Court's task is to determine as best as possible under these circumstances what the Wyoming Supreme Court would say. And that Court interprets statutes to reach the most likely and reasonable interpretation, giving their design and purpose. So that's essentially the goal. And we believe that there's really two points that inform not only the interpretation of 101A2, but also the application of this Court's prior panel rule, which, of course, is now invoked, given the issuance of the Lexington Insurance Company decision in February's intervening case, which is the subject of some 28-J, our 28-J letter and infrastructure response. Excuse me. But those two points which we see as core is, first, that Sinclair's interpretation of this language, of the delivered and issued for delivery language that's in 101A2, is clearly one possible interpretation that's acknowledged in many jurisdictions. There's no doubt that courts have disagreed about this. Some courts, some states have taken a very narrow view of that language. Other states have taken a very broad, flexible view of that language. And we've cited two cases from Florida, from New York, from Washington, from Pennsylvania, from Louisiana, and even from the Virgin Islands that indicate a broad, flexible understanding. So this is not a minority view. It's out there. There are many that take this view that that language is really meant to ensure that risks that are, you know, when an insurance company reaches out and essentially targets a citizen of a state with coverage and receives premium payments for that, and it kind of knowingly does so, that that insurer is going to be, which is reasonable, subject to that state's insurance code. The second point, so it's at least one interpretation. Yes, Your Honor. Counsel, this is Judge Timkevich. Aren't we stuck with Lexington? We don't believe that we are stuck with Lexington or that the panel is stuck with Lexington. It does cover the issue that you're arguing on appeal. It's a recent opinion, obviously, in our circuit. Prior published opinions are binding on subsequent panels. So if we want to kind of get to the broader interpretation that you're advocating, how do we extract ourselves from the clutches of our prior precedent? Well, Your Honor, we would say that, yes, this panel would be bound by an actual holding, by a matter that's actually decided by a previous panel, considered and decided, raised by the parties. But we don't think that that applies here. One case that I actually shared, it's not in the briefs, but I shared it with opposing counsel as we were preparing for this, U.S. v. Crow, which is 735, Fed Third, 1229. It's a 2013 Tenth Circuit case. And the particular facts aren't as important, but at page 1240 it says, a panel is not bound by an assumption that's neither placed directly at issue by the parties in Mullins nor explicitly decided by the panel. What happened in Lexington is one party essentially says that, look, the policies, and it was undisputed, nobody raised any issue concerning the meaning of the statute. It was undisputed that, or at least one side said the policies were issued and delivered in Texas, and so the statute does not apply. There was no comeback. But it is on point, though, is what I mean by it says what it says, and kind of that second element of Crow seems to be that. Well, the primary issue, though, is that there was no consideration of what – of the essential points of the argument. As the panel went to discuss in the opinion, that precision, which was the other party, it does not address the substance of the argument. And it merely said, well, that's out because you raised it. It was a waiver response. So there was no presentation to the panel of what we see as the absolutely essential points that this language is term of art language. This language, as has been acknowledged in many jurisdictions and treatises and so forth, this is term of art language. There's no discussion, and we pulled the briefs. I mean, there's no raising of any of this in the briefs. There's certainly not any discussion of the only on-point Wyoming state authority that exists, and that is the informal opinion from the Wyoming Attorney General's Office that expressly adopts the very interpretation that Sinclair is advancing here and that has been adopted in many jurisdictions. So the panel was not aware of any of that, and so instead simply adopted what the advancing party said is, hey, they weren't physically delivered in Texas, and so that's it, no response. And so we don't really believe that that panel's discussion of that issue moves the ball or is something that has to be bound to because it was without what was absolutely necessary to make such an analysis of a state law, especially on a matter of first impression in this way. Thank you. Let me open it up for Judge Bacharach and or Judge Carson. Okay. Thank you, Chief Judge. I just have one question, I think, and I want to focus on a little bit of a different topic that you focus on largely in your briefing, and that is the somewhat unusual language that the policy should be interpreted as if it were issued to Sinclair, Wyoming. How do you – it's interesting and certainly intriguing language, but how does that actually fit in to the language in 2615-101? In other words, regardless of whether it was issued or as if issued to Sinclair, Wyoming, how does that tend to support the idea that the policy was issued for delivery in this state or delivered in this state? Well, we believe, Your Honor, that that demonstrates a very unique – and you're right, it is very unique language. And when I first looked at that, I just assumed that this was somewhat boilerplate language and in the research found I could not find it anywhere. I think it is very unique language. It is – it seems to make the intent that is the district court mentioned. There's got to be some intent that this be delivered to Sinclair, and this seems to uniquely demonstrate that this is intent. In fact, it appears that the parties or really the insurers, they're the drafters of this, wanted to foreclose any argument that the policy was not being issued to each of the named insurers. In other words, it's language that seeks to avoid this type of hyper-technical or formal thing. Obviously, this issue can come up when you're talking about something's not effective until it's been issued and so forth, and they seem to want to avoid that. And so we want to avoid that to issue the policy to each named insured, but now seem to be turning around to say, wait a minute, it hasn't really been issued to Sinclair, Wyoming. It was only issued to the parent company. And that – if we're looking for what the intent was, and when we're talking about either constructive delivery, which is under the Tillman case or under the cases that we mentioned in our brief on page 25, which are several that talk about the notion of constructive delivery, or if you're just talking about the notion of issued for delivery, it all comes down to intent. Each one of these cases talk about the intent. All the cases out of Florida, which, by the way, directly disagree with the federal decision that's cited by InfraSure, and I believe that we should follow the state – if a state appellate court has ruled on a matter of state law, that should be compelling. But each one of those comes down to, well, what was the real intent here? The real intent was to insure risks located in that state with foreign insured in that state. And this language uniquely says that. Well, and I'm sorry to interrupt you, but you certainly understand your argument, your distinct argument for the legislative purpose, but in terms of just semantics, the language itself, let's say we substituted the language in the policy that the policy will be as if it was issued to Bob Bacharach. How does the issuance to Bob Bacharach or to Sinclair Wyoming say anything about where the policy is going to be mailed? In other words, even though this is unusual language, it doesn't say it's going to be mailed or delivered to the state of Wyoming or it is issued for delivery in Wyoming. So if we are simply transposing this unusual policy language against the language in 2615-101A2, I don't understand how that language helps you on your semantic argument. Certainly. Well, Your Honor, I think it comes down to the question of what does delivery mean? And as the Wyoming attorney general's office indicated that something is delivered when that premium is accepted and insurance coverage is extended. I mean, that was their opinion. And the many cases that talk about instructive delivery, that could fit in here with, all right, well, this is being issued. It needs to be understood as having been issued. And we consider that as being, in other words, this is being fully extended to each of these insured and which then means, given that intent, constructive delivery. Now, there's another aspect of this, too, that, you know, one thing that — I might add that you're cutting into your co-counsel's argument time, too. But you're at the 12-minute mark, and I just wanted to alert you to that. Yes. Thank you very much, Your Honor. I'm going to make one more point, and then I'm going to be quiet so that Kate can speak. You know, the infrastructure mentions several times, if we're looking for things on the face of the policy as a specifically set out named insured, this is not a group policy where the insurance company has no idea, really, who's becoming an insured, which can happen years later. This is somebody that has been underwritten, specifically named. The information about the refinery is known to the insurer when this is put together. And then, infrastructure, as they even note on pages 21 and 36 of their brief, and even at page 2 of the motion to dismiss, is that the policy itself says, gives one address for contacting plaintiff, its parent company, plaintiff meaning Sinclair, Wyoming, and that the policy gives the Sinclair companies, that's the parent, the right to act on behalf of all insurers. So if we're looking for intent here, and we're looking for constructive delivery, it seems hard to believe, especially given the guidance from the Attorney General's office, that the Wyoming Supreme Court would not say, all right, you indicated that this is considered to have been issued to each named insured. Let's assume that it was mailed. We still don't know exactly where it was mailed. But let's assume it was mailed to the parent company in Utah. Why can't we consider that, given that even the other side admits you're basically acting on behalf of all the named insureds, including, as it says in the policy, the right to receive notices of cancellation, which would apply to everybody. That's at the appendix at page 123. That seems very strong that the Wyoming Supreme Court could easily say, well, that certainly, under those unique faxes, is constructive delivery. Now, at that point, I'll give my co-counsel at least a minute. Thank you. Your Honors, this is Kate Margolis on behalf of Sinclair Wyoming. And I will cede my time and, if at your pleasure, reserve the remainder of our time for rebuttal unless you have questions that you'd like to ask. Judge Backrock? Judge Carson? Oh, I'd certainly approve of that question. I don't have a question. Before you sit down, I'll give you some rebuttal time. What's your – what do you think the essential flaw is in the insurer's argument? What do you think your strongest rebuttal point is on the cross-appeal? Well, I would briefly make two points. First, the record shows that the umpire considered all the conflicting evidence presented by the parties. Once you accept that the umpire did his job and based the award on more than the settlement, this court's inquiry ends because it was the appraiser's role to weigh the evidence. And the second point is that everything in the appraisal record was agreed to by infrastructure with no limiting instructions. Infrastructure acts as if the settlement and Mr. Mastracchi's post-settlement final report were inadmissible evidence, but they were in the record. Okay, thank you, counsel. I'll give you some rebuttal. Let's hear now from Mr. Knight. Thank you, Your Honor, and may it please the court, this is Diane Knight for Infrastructure. Infrastructure still has not received that appraisal that it is owed under the policy because the umpire simply did not appraise Sinclair's loss because he did not decide when Sinclair would have completed the repair with due diligence and dispatch, which is the policy language. The umpire began and ended his analysis with the commercial settlement. The commercial settlement that Sinclair's president admitted was, quote, purely about dollar amounts and not about principles of claim valuation. I'd like to talk just about one fact issue that shows how the umpire ignored his duty and the significant consequences. So the markets timeline expert calculated that the repair was delayed by nine days in March 2014, so Sinclair could voluntarily change the metallurgy of some components. And Sinclair's own turnaround manager, their employee, admitted at his deposition that this change had nothing to do with the fire. And that admission means that those nine days cannot be included in the repair timeline that's calculated for the insurance purposes. And if you just take out these nine days, which Sinclair's own employee admits weren't caused by the fire, that would reduce Sinclair's covered loss by millions of dollars. But the umpire didn't address this issue. And we know that because in the award, the umpire explained exactly what he did to calculate his end date. He started with the commercial settlement. He considered the actual end date, which can really only be the starting point for determining whether the repair was done with due diligence and dispatch. He relied on these false facts about whether or not other insurers would agree to a later date. And then he relied on Sinclair's concession in the appraisal that it would remove 10 days from the timeline. This really bears a pretty stunning resemblance. Counsel, this is Judge Simkins. Are you really making like a clear error argument? Because our standard review is good faith, lack of bias, fraud, those sorts of things. Is your underlying position was that the umpire was active with animus or bad faith or bias? Is that how we're going to have to get around the report that he prepared? That's not what's needed to get around the report. Because if you look at the Zarvor case, which is one of the cases that Sinclair relied upon, what the judge there said is that because the panel didn't comply with the terms of submission, the challenging party there, and I'm quoting, need not show fraud, bias, or bad faith to reopen the appraisal because the panel did not complete its contractual task. So we do not need to show, and we're not arguing that the umpire acted in bad faith or with bias. He just didn't do his job under the contract. And the district court clearly erred when it found that the award was based on something other than the settlement. Because what's odd here is that the party that's defending the award, and the district court as well, are asking the panel to ignore the award. Don't pay attention to what the award actually says. Pay attention to the email. I mean, that's bizarre to begin with. But it also doesn't help Sinclair because what the emails show is that each side's appraiser was looking at the evidence, but the umpire was just looking at the settlement. His very first email to the panel is asking, why is the $60 million settlement not the floor? The very last sentence of his award says that the award was prepared in response to settling the litigation. Was it error for him to rely on the settlement at all? Or are you just saying he overly relied on it? Because we believe it was record after all. So we believe that it was error to rely on the settlement. And that's what this court decided in the Murray case and what the Eighth Circuit decided in the Eldredger case. If you can't just say, well, here's what parties agreed to. And so I'm going to add a few dollars here or take a few dollars there. That's just not a valid way of doing an appraisal. And with respect to the materials in the record, an appraisal is not a formal arbitration-like process. I think that both sides are interested in giving the appraisers as much information as we can because the appraisers are supposed to be experts. They're supposed to look at the facts. And if you go to that last market appraiser's report, you see that there are facts in there. There are facts about the loss that would be calculated using the end date that was reached based on the expert's analysis of the evidence. Are you talking about Mastracci's report? That's correct, Your Honor. So there is underlying facts in there that certainly can be considered. But what the umpire is basically saying is that, well, if 17 of your friends want to go jump off a bridge, then infrastructure has to as well. That's not why we went to appraisal. That's not why appraisal exists under the policy. It exists so that experts can look at the evidence and reach an expert decision. You know, another one of the questions the umpire asked is, you know, why would Sinclair settle this case if it believed it? Why would infrastructure? Those are not the questions that need to be considered. What needs to be considered are the facts. And the umpire simply ignored the facts. If there are no other questions… Judge Bacarach, do you have, or Judge Carson, any questions on the appraisal issue? I do, but Judge Carson, you go ahead because I… I don't have any. You can go ahead. Yeah, counsel, let me ask you a question about the point that you're just making with the chief, and that is about these emails. For example, the email that said, why isn't the settlement the floor? Let's say, well, in this oral argument, let's say I hypothetically just say, well, what's wrong with that? Why isn't the settlement, shouldn't that be the floor of the appraisal? And you answer it. I'm sure you can give a beautiful, very convincing answer. And then the opinion comes out, and there's a petition for rehearing. And that is to say, well, the panel was misguided because notwithstanding whatever the opinion says that you're relying on the transcript of the oral argument and that one of the panel members asked this completely irrelevant question, why isn't an email with the quasi-adjudicator, the umpire, asking through email prior to the issuance of the written opinion, why is that fair game to talk about what the final decision is? We all ask a lot of questions, and I'm sure the umpires at appraisals… I've never been an appraiser, but I'm sure they ask a lot of questions too to try to figure things out. And then presumably the umpire's adjudication, like our decisions, rests fail or arise on the written final product. Why is that relevant? So it's interesting, Your Honor, because InfraSure didn't put those emails in the record. Sinclair did. Speaking for InfraSure, I would love, Your Honor, just to look at the award because the award is very clear about the facts that went into the analysis, and that's the commercial settlement, these false facts about what other insurers would have done about subrogation, Sinclair's court trading, and the actual end date of the repair. I mean, the umpire really was very clear about what he relied upon to reach his determination, and the fact that Sinclair read that award and said, no, no, what you really need to look at is all these emails, really set the volumes. Okay, so I think your point is we really should be looking solely at the final decision and not the prior emails, right? I would love it for the panel to look just at the decision because the decision is very clear about what it relied upon, and it's not the underlying facts. It's not all of the stuff about the ridiculously late piping ordering. It's not the voluntary work that Sinclair did. It's really just focusing on the settlement. Okay, so let me switch gears a little bit and go back to what you're exchanging with the chief about Mastracci's two reports. The umpire, as I understand it with regard to Mastracci's second report, said that he had attributed the change from either the end of February or March 1st to the end of March to the existence of new information, and you're saying that there was no new information. Is that right? It is except for one thing, which is that I'm not saying there was no new information. Sinclair's president is saying that. Okay, fair enough. Fair enough, yeah. You're right. I didn't mean to interrupt you, but you're right. So can I follow up on that? And I didn't mean to talk over you, but between those two reports, though, there was, because of the settlement, am I incorrect that the record shows that all of the experts were providing a lot more information in order basically to substantiate the settlement with regard to the hypothetical start-up date for the refinery in connection with those settlement discussions? So there was additional expert work being done, wasn't there? There was not, Your Honor. There was a presentation that Sinclair gave at that settlement meeting, but it was not new information. The experts had been meeting with Sinclair for over a year, and that's why, again, to go back to the president of Sinclair and his testimony, he said at that meeting what we did was we talked, quote, purely about dollar amounts and not about principles of claim valuation, close quote. So this was not, you know, there was a whole bunch of information that we got at the end, and that changed things. This was four insurers went to the meeting, hit a dollar amount, and the email showed that the experts were sort of left in the position where they had to backfill their decision. Okay. Go ahead. Sorry. I apologize. I would love to reserve at least some of my time, but I do want to talk very briefly about Sinclair's appeal. And I think that the panel was asking about this earlier, and Lexington really does end this case. This issue was squarely addressed and decided in Lexington. It was not an implicit assumption in Lexington. It was decided. And what Sinclair is really asking this court to create is a Monday morning quarterbacking exception to precedent, which is that, well, a prior litigant didn't make all the arguments that I would have made, and therefore I should get a second bite at the apple. That's just not the way that I think that precedent works, and I don't think that any court wants to inundate itself with lots of briefs trying to relitigate old decisions. Setting that aside, what do you say about the Wyoming Attorney General opinion? Well, first off, it's not a Wyoming Attorney General opinion. It's a letter from an assistant attorney general to a deputy at the Insurance Commission. But the other thing is that it's really not talking about the question that's before this panel. The question that that letter was addressing was, what do you do when you have a general class of insurance products, where you have a master policy that is filed in one state, and then you have certificates of insurance mailed to Wyoming residents? And what the assistant wrote was that, well, a certificate counts as a policy, and therefore it comes under the Wyoming Insurance Code. So the letter was not about – it didn't analyze the word deliver. The thing that it really analyzed was the word policy. And if you go and look at the cases that the letter cites, you'll see that they're all about what is a policy. So the letter not only wasn't an attorney general letter. It really was not about our issue. All right. I think your time has expired on that issue. I'll have some flexibility on the time, but I think we can turn back to Ms. Margolis, and let's give her four minutes for the rebuttal time. Chief, I hate to ask you this. You're welcome to say no, but do you mind if I ask one more question? Of course not. Okay. I appreciate that. But I wanted to get on – ask you a question about the Lexington case that was just recently decided. In the appendix to that case, they actually had the policy language that's not on the face of the opinion. And the policy – and I want to ask you if this changes the degree that you feel comfortable in relying on the Lexington opinion. It says, the insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as a surplus lines coverage pursuant to the Texas insurance statutes. And so when – and that's the end of the quote. And so when the panel opinion says that Lexington policies were issued in Texas so the Wyoming Code isn't applicable, well, that seems a fairly uncontroversial opinion, and I'm not really sure how that has anything to do with our case. It's the policy specifically says that those policies were issued under Texas insurance statutes. Did that – am I wrong about that? So I think that the reason that it doesn't change the result here is because the policies there unambiguously covered losses – excuse me, risks located in Wyoming. And so the question that I think Sinclair's appeal presents is what do you do when you have a loss – a risk that's located in Wyoming? Is that enough to get within Chapter 15 of the insurance code? And the Lexington court had a risk in Wyoming, had a policy issued for delivery in Texas, and the fact that it had a Wyoming risk didn't matter. And by the way, this is not the first time that the Tenth Circuit has come to that conclusion. So if you look at the Buell case that we cite in our papers, that was a Colorado statute identically worded to the Wyoming statute, and this court applied a literal reading. The Crawford case that we cite in our papers, this court affirmed a district court interpreting the same statute before us today. It applied a literal reading, and it got affirmed by this court. And, in fact, if you canvass the cases that are out there, every single federal court of appeals that has addressed a statute like this has focused on where is the policy delivered, not where is the risk located. Okay. Thank you very much, and Chief Judge, thank you for indulging me with that question. All right. Let's hear from Sinclair, then Ms. Margolis, and you'll have four minutes. And I'm going to – because of the cross-appeal nature, it's a little procedurally awkward case, and thus we're doing it in an unusual format, I'll give Mr. Knight a few minutes of surrebuttal. So with that, Ms. Margolis, I'll give you four minutes. You may proceed when you're ready. Thank you, Your Honor. I just want to touch on the standard of review. This is Infra's second appeal of the appraisal award, so it has not one but two very deferential standards to overcome. As the court is aware, to overturn an appraisal award, there must be clear and convincing evidence of a failure to perform, a gross mistake, or misconduct. The e-mails that Sinclair places to the record are evidence to corroborate that the umpire here did his job. He considered the evidence offered and the positions argued by both parties. The cases at Infra's site were completely distinguishable. The umpire did not refuse to consider or deliberately omit relevant information that was presented by Infra's juror, as in Javant and Aetna v. Murray, nor did he make an arbitrary compromise, flip a coin, with Sinclair's appointed appraiser, as in the Eldrocker case. In fact, the umpire considered what might be called the new information conspiracy theory and rejected that theory. So he got that standard of review, and then the district court held that Infra sure failed to meet that standard, failed to show that there was a failure to perform, a gross mistake, or misconduct. That ruling was supported by numerous findings of fact. So therefore, Infra sure must also convince this court that the district court's fact findings were clearly erroneous and imprevisible on the record. And we contend that Infra sure is not able to do that. At bottom, what's really going on is Infra sure nearly disagrees with the umpire's exercise of his judgment in weighing the competing arguments. Isn't it odd that the appraisal – the umpire's amount was the same as the settlement number, which was a matter of give and take among the parties? That seems strange that they'd end up at the same destination when you're talking about basically resolving a – selling a case versus an independent objective of assessment. Well, Your Honor, you can look at the award. In fact, the court could just simply look at the award should it want to. You cannot read that award and believe that the umpire relied solely on a settlement or a settlement amount. He considered evidence by no fewer than seven energy industry experts and forensic accountants, and those are listed there in the award. The experts had opinions that ranged all the way from the low. Infra sure's expert numbers were much, much lower than all the other experts. You can look at the numbers in the award and see the spread. And as they say in Sesame Street, you can see which number does not belong. And as to the new information question, which is central to the conspiracy theory – and the court may remember that the theory is that Mr. Mastracci lied in his final report about relying on new information to justify the settlement amount, which Infra sure argues was too high. I would refer the court to Infra sure's supplemental appendix at pages 120 and 412. There, Mr. Mastracci made a statement in his final report and in some emails about why he changed his opinion in his last two reports. Your time has come up, but before you hit the mute button, Judge Bachrach or Judge Carson, do you have any final questions? I do, but I wanted to defer to Judge Carson. I don't have any, Bob. Go ahead. Okay, thanks, Jill. So I have a somewhat different question on the cross-appeal. So the umpire takes April the 26th and says, well, but Sinclair is willing to deduct 10 days from that, and so I'm going to say that the hypothetical start date was April 16th. Why isn't that, the backing off of 10 days, an exact application of what Infra sure is complaining about in a somewhat different context? Obviously, they're not talking about the context with the entire market, but it seems to be that saying, well, okay, we're going to go to April 26th, and then we're just going to say, well, one of the parties is willing to take off 10 days. It sounds like what I used to do when I was conducting settlement conferences. Well, the plaintiff is willing to drop 10 days. Why isn't that, the deduction of 10 days, really nothing more than those old cases that say you can't assess a loss, you can't appraise a loss based on what the party's willingness to take? Well, Your Honor, I would say that first, obviously, that decision by the umpire may have been in Infra's favor. It might have been Sinclair's objection to raise in that case. But if that were all there were here, perhaps that might be a valid argument. But in this case, it's apparent from the record that there was voluminous pieces of evidence and conflicting expert opinions about what the period of restoration should be. And I think the umpire and the appraiser for Sinclair and most of the experts believe that it fell within the range March 31 through April 26, which was the actual date. So I don't think that that by itself is enough to overturn an award where it is apparent that the appraisal panel and the umpire specifically substantially complied with the terms of the submission, took the job seriously. He made his decision honestly and in good faith and was sufficiently thorough in reviewing and considering the evidence offered by the parties. Okay, thank you. All right, Counsel, thank you very much. Your time has expired. Mr. Knight, I'll allow you four minutes as well for any final thoughts that you have. Thank you, Your Honor, and this is Diane Knight again for InfraSure. I believe that that question and response really shows why exactly we need a new appraisal, not just signing off on what the email traffic shows that was done. There's only four things that the umpire relied upon according to his own award. And one of them is exactly the kind of horse trading that those prior decisions said is not okay. You know, I've gone through those four things multiple times, but he really does begin with the settlement and then end with the settlement. And that's not an appropriate basis for an award that is supposed to be rendered by experts based on evidence. If I could, I would like to go back to Sinclair's appeal in one point that was raised in the initial round of questioning, which is about the policy language that the policy would be construed as if issued to all of the insureds. And that really does not help Sinclair, because there's only one place where all of the insureds are located, and that's Salt Lake City, Utah. So the policy can be construed as being issued to all of those individual insureds, and that just gets you back to Utah through lots and lots of different entities. And that's another way in which this policy does bear a resemblance to the one in Lexington, because here the parties specified in the contract where that one location was going to be. You know, this was a policy that was written by Sinclair's broker, Marsh. It says it on the top of each page. Sinclair alleged in their complaint that these policies are written by brokers. Sinclair's broker could have put any address in there it wanted. It shows Utah, and it should be bound by that choice. And I'm happy to answer any other questions that the panel might have. Council panel, any further questions? Don't be shy. Sorry, Chief. I have one question. On Sinclair's part of the appeal, they've argued in the alternative that they should be entitled to an evidentiary hearing on whether the policy was actually delivered to Wyoming or intended for delivery to Wyoming. And I know you said that, well, there were no allegations in the 12B6. There were no allegations in the complaint. But I'm not really sure why, if we agree with your interpretation of the policy, that it has to be delivered in Wyoming or intended for delivery in Wyoming, and reject the constructive delivery theory of Sinclair's, why they shouldn't be entitled to an evidentiary hearing. It's not the sort of classic factual issue that we would expect typically a plaintiff to allege in the complaint about the applicability of the statute. It's more the applicability of the law, which is a legal issue that you don't have to plead. Why shouldn't they, at least in the alternative, be entitled to an evidentiary hearing? Because they actually did ask for one in district court, and it was refused. Your Honor, I believe that the McDermott case where the Fifth Circuit addressed a statute like this is constructive on this point. If I can just finish answering this question. In that case, the Fifth Circuit had a very similar posture to us, a review of an award. And the court didn't have further fact-finding. And it said because this policy was negotiated in London, issued in London, all of the facts that were available said you go to London. Here, Sinclair has alleged that this policy was made in London, that all of the conduct happened in London. If you look at the policy, it's dripping with references to London. The other place it's dripping with references to is Utah. It's not plausible that you can look at this policy and decide that, well, maybe there's some potential happenstance that it could have been issued to Wyoming. And then, of course, the other reason that you don't get to an evidentiary hearing is the choice of law argument, which we haven't really talked about today, but would need to be resolved if the panel doesn't look at that statute and say it doesn't apply here. Okay. Thank you. Thank you, counsel. We appreciate the fine arguments this afternoon. The case will be submitted now, and counsel are excused.